Frederico C. MARIANO, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 76-502-N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Nov. 17, 1977.

David P. L. Berry, John B. Gaidies, Norfolk, Va., for plaintiff.

Michael A. Rhine, Asst. U. S. Atty., Norfolk, Va., for defendant.

## MEMORANDUM ORDER

KELLAM, Chief Judge.

Plaintiff, a Chief Petty Officer on active duty in the United States Navy, seeks to recover compensation from the United States under the provisions of the Federal Tort Claims Act, 28 U.S.C. Section 1346(b) and Section 2671 et seq. for injuries sustained while working as a part-time employee of the Navy Enlisted Mess Open, known as the Tradewinds Club, a non-appropriated fund activity situated on the Naval Station, Norfolk, Virginia (Tradewinds). He filed his claim with the Commanding Officer of the Naval Base, Norfolk, which was denied by the Department of the Navy on the grounds that the United States had no liability for such injury. This suit followed.

I

On September 28, 1973, plaintiff was working as a part-time employee during his off-duty hours in the Tradewinds Club. At time of the injury, he was attached to a command located on the Naval Station, Norfolk. Part-time employment was permitted by the Chief of Naval Personnel, as provided for in Special Services and Messes

Personnel Manual, para. 202 which provides in part that "enlisted personnel, whether or not regularly assigned to the non-appropriated fund activity, may be hired in a civilian capacity and paid from non-appropriated funds." The regulation provides that such work must be performed during off-duty hours, must be voluntary, and must not interfere with the proper performance of such person's military duties. Nor may such a person be hired in such a position which regularly involves more than 32 hours of work per week.

At time of the accident and injury on July 13, 1974, plaintiff was in an off duty status from his command, on liberty, but not on leave. He was subject to recall to his command at any time while he was working in the Tradewinds Club. In the performance of his duties at the Tradewinds Club, he was serving as a night manager at the front desk checking identification cards. Some four or more night managers or assistant managers are employed at the Club. While on duty in the Club, he heard a call over the public address system for night managers to proceed to the bar room to provide assistance. As he proceeded, he observed three or four people running in his direction, which was near the main entrance. He heard one of the night managers shout "stop that man." Plaintiff grabbed a man, later identified as Seaman Ray Smith, identified himself and told Smith he was under arrest. He held Smith under control briefly, but a crowd of young black patrons surrounded plaintiff and Smith and commenced assaulting plaintiff, shouting "Don't let our brother be taken away." Smith escaped. Plaintiff pursued one of those who had assaulted him and observed Smith being caught and restrained by one of the night managers. Smith again broke away from the restraint and threw a glass at plaintiff, striking him in the face. As a result of the striking, plaintiff sustained loss of vision in his right eye.

After hospitalization and treatment, plaintiff returned to and continues on active duty as a Petty Officer in the United States Navy. He received and is still receiving full medical treatment and care provided by the Navy.

II

Plaintiff grounds his right of recovery under the Federal Tort Claims Act, contending that at time of his injury plaintiff was employed in a "civilian capacity" and that the injury did not arise out of activities incident to his military service. He asserts the injury arose in part-time employment during his off duty hours.

The alleged negligence of the United States is in the assertions that (a) the defendant failed to provide plaintiff with a safe place within which to work, and (b) failed to provide plaintiff with reasonably safe and suitable tools to perform his duties.

The Tradewinds Club is a non-appropriated instrumentality, owned and operated by the United States at the Naval Station, Norfolk. The policies, regulations and procedures for the operation of all enlisted messes ashore, including the Tradewinds Club, are under the technical direction of the Chief of Naval Personnel. Requirements, duties, instructions and guidelines for the operation and administration of such clubs are set forth in the instruction manuals prepared by the Chief of Naval Operations. Such manuals state that the purpose for the establishment and maintenance of such facilities is the well-being, morale and efficiency of enlisted personnel. The operation of such facilities is the direct responsibility of the Commanding Officers to the same extent as any other elements or facilities of their command. Under the direction of the Chief of Naval Personnel, Commanding Officers have the responsibility to issue appropriate regulations and instructions for the operation of such facilities.

At the time of the injury Captain Samuel S. Anders, Jr. was the Commanding Officer of the Naval Station, with overall command over the Tradewinds Club. The next in line under Captain Anders was civilian employee Robert E. DeVary, Director of Special Services. Director of the enlisted messes was civilian Samuel G. Copeland, and on the

date of the injury, directly under Copeland, was civilian employee Hollifield, who was the day to day manager of the Club. Hollifield was assisted by three assistant managers, who were sometimes referred to as duty night managers, two of whom were civilian employees, and one of whom was an active duty enlisted man working as a part-time employee. Assisting these persons in the operation of the Club and the maintenance of order were night managers. All of the night managers were active duty petty officers or non-commissioned officers, who were said to have been selected because they had demonstrated military leadership ability. Administrative and operational instructions for the Club were issued or approved by the Commanding Officer. Club privileges were extended to those having connection with the Armed Forces. Authorized persons were permitted one civilian guest. The manual of the Naval Station set forth directions and guidelines for the maintenance of order in the Club.

### III

Prior to July 1973 the Tradewinds Club had been operated and administered by the Naval Exchange Officer under the Navy Exchange System. During the term of its operation and for a while after Special Services took over the operation of the Club, uniformed civilian police of the Naval Station Special Police Force and active duty personnel of the Shore Patrol, in uniforms, were on active duty inside the Club to maintain order. The night managers who were then called the Security Force under the Navy Exchange System carried handcuffs on their persons.

Under the operation of the Navy Exchange and Special Services, disturbances arose at the Club. Some were minor and on other occasions the Special Police Force was requested to lend assistance. At times, customers of the Club were arrested or taken into custody, incarcerated or returned to their command for action.

Complaints were made that the night managers were misusing their authority and that the presence of uniformed police and shore patrolmen contributed to the problem of disorder within the Club. The Commanding Officer, the Chief of Police, the Special Services Officer, and the Enlisted Mess Director, after discussion, all concluded that the presence of Special Police Force and shore patrol personnel antagonized the patrons of the Club. By agreement of all of them, the Commanding Officer decided that uniformed personnel should be removed from the Club and in their place, to put the night managers into distinctive civilian dress, so that they could be identified from the patrons, but would appear to be hosts. He directed that handcuffs not be carried by the night managers, but that a set of handcuffs be kept in the office for use when needed. The more credible evidence established that the removal of the uniformed officers resulted in better discipline and less disorder.

The procedure for operation of the Club was revised and the new policy fully explained to the night managers, including plaintiff. Among other things, the policy adopted was to try to reason with anyone creating a disturbance; to get him to agree to go to the office of the Club to discuss the matter. That is, they were not to be strong-armed. Persons who could not be reasoned with, or who were involved in fights and disturbances were to be handled by the Station's Special Police Force. As a result of this policy, the Police Force reinforced what it called its "HIT Squad," and put some officers in plain clothes who would be stationed outside the Club. From time to time they were to enter the Club to keep an eye on things. Uniformed police were also stationed nearby. The Chief of Police stated that he was set up so that he could have a force of 40 or more duty policemen in the Club in four or five minutes.

All of the funds for the operation of the Club and pay of the employees were either military appropriations by Congress or non-appropriated funds generated by military recreational activities.

## IV

The first issue presented in this case is: Did the plaintiff sustain his injuries in the course of activities incident to service. If he did the Government is not liable under the Federal Tort Claims Act, *Feres v. United States*, 340 U.S. 135, 71 S.Ct. .153, 95 L.Ed. 152 (1950), and the case must be dismissed. If, however, the injuries did not arise incident to service, there are other questions to be answered.

*Brooks v. United States*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1948), was the first case to consider whether members of the Armed Forces could sue the Government under the Federal Tort Claims Act. In *Brooks*, one serviceman was killed and another injured when the car in which they were riding was struck by an Army truck being driven by a civilian Army employee. At the time of the accident the two men were on furlough. The Supreme Court allowed them to recover, but noted that had the accident been incident to service it would have been a different case. The Court, however, expressed no opinion on how it would decide such a case.

*Feres, supra*, a consolidation of three cases on appeal, established the "incident to service" rule. In one of these cases a serviceman on active duty died when the barracks in which he was sleeping caught fire. His executrix claimed the United States knew or should have known the barracks to be unsafe and that it was negligence to quarter men in them. The other two cases involved injuries and death resulting from the alleged negligence of Army surgeons. In both of these cases the soldiers were on active duty during the operations.

The Supreme Court decided that these injuries and deaths were all incident to service and denied recovery under the Federal Tort Claims Act. The plaintiffs argued that *Brooks* should apply to their cases, but the Court distinguished that case:

> The common fact underlying the three cases is that each claimant, while on active duty and not on furlough, sustained injury due to negligence of others in the armed forces. . . . This is the

"wholly different case" reserved from our decision in *Brooks*.

340 U.S. at 138, 71 S.Ct. at 155, and

> The actual holding in the *Brooks* case can support liability here only by ignoring the vital distinction there stated. The injury to Brooks did not arise out of or in the course of military duty. Brooks was on furlough, driving along the highway, under compulsion of no orders or duty and on no military mission.

340 U.S. at 146, 71 S.Ct. at 159.

The distinction the Supreme Court makes between *Brooks* and *Feres* seems to be whether the serviceman was on active duty subject to military discipline or on furlough. Further support for this interpretation can be found in *United States v. Brown*, 348 U.S. 110, 111–2, 75 S.Ct. 141, 99 L.Ed. 139 (1954).

That the duty status of the serviceman at the time of the injury determines if he can bring suit under the Tort Claims Act is indubitably the law in this Circuit, even if, perchance, there should be some question about the Supreme Court's decisions. *Hass v. United States*, 518 F.2d 1138 (4th Cir. 1975). In *Hass* an active duty Marine Lieutenant was injured while riding a horse he had rented from a stable that was owned and operated by the Corps. The plaintiff argued that his activities at the time of the injury must be directly related to his specific military duties and that the suit must tend to interfere with military discipline before a serviceman will be barred from suing under the incident to service standard of *Feres*.

The Fourth Circuit explicitly held this to be an erroneous interpretation of the law and it concluded that the proper test was whether the plaintiff was on furlough or active duty when injured. 518 F.2d at 1140–41. His being temporarily in an off-duty status is irrelevant. 518 F.2d at 1142. These same contentions are made by the plaintiff here and should be rejected.

Furthermore, in showing that "incident to service" is not a narrow term restricted to actual military operations, the Fourth

320

Circuit, seemingly with approval, cited *Richardson v. United States*, 226 F.Supp. 49 (E.D.Va.1964). See 518 F.2d at 1141. That case, decided by this Court, is almost identical to the case at bar, and recovery was denied there.

Finally, the plaintiff brings a novel contention here. He claims that for an injury to be incident to service the serviceman must have been receiving direct benefits from the military at the time of the injuries and he must have been involved in service activities. Although this theory may have a close relationship to the facts of *Brooks, Feres*, and *Brown*, in none of these cases was the decision based on such a rationale.

The Court finding that the injuries were received incident to service, the complaint is DISMISSED.